**BELLSOUTH
TELECOMMUNICATIONS, INC.,**
Plaintiff,

v.

**ITC DELTACOM COMMUNICATIONS,
INC., et al., Defendants.**

Bellsouth Telecommunications,
Inc., Plaintiff,

v.

ICG Telecom Group, Inc.,
et al., Defendants.

Nos. CIV. A. 99–D–287–N, 99–D–747N.

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 18, 1999.

Atley A. Kitchings, Jr., Jeffrey E. Holmes, Lange, Simpson, Robinson & Somerville, Birmingham, AL, William J. Ellenberg, II, Thomas B. Alexander, Edwin E. Edenfield, Jr., R. Douglas Lackey, BellSouth Telecommunications, Inc., Atlanta, GA, D. Owen Blake, Jr., BellSouth Telecommunications, Inc., Birmingham, AL, for Plaintiffs.

William D. Coleman, Capell & Howard, PC, Montgomery, AL, Alan P. Shor, Atlanta, GA, Edgar C. Gentle, III, G. Nicole Mapp, Gentle, Pickens & Eliason, Birmingham, AL, Richard M. Rindler, Swidler Berlin Shereff Friedman, LLP, Washington, DC, William Joseph Baxley, D. (Randy) Randolph James, Jr., Baxley, Dillard, Dauphin & McKnight, Birmingham, AL, J. Fairley McDonald, III, Peter S. Fruin, Maynard, Cooper & Gale, P.C., Montgomery, AL, Jonathan E. Canis, Enrico C. Soriano, Kelley, Drye & Warren, Washington, DC, William Ogletree, McCain & Ogletree, PC, Gadsden, AL, Scott A. Sapperstein, Intermedia Communications, Inc., Tampa, FL, Terry L. Butts, Cervera, Ralph & Butts, Troy, AL, Kenneth D. Wallis, II, Capell & Howard, PC, Montgomery, AL, William H. Pryor, Jr., Attorney General, Office of the Attorney General, James Eldon Wilson, Pappanastos, Wilson & Associates, Montgomery, AL, for Defendants.

## MEMORANDUM OPINION & ORDER

Before the court is Plaintiff BellSouth Telecommunications, Inc.'s ("BellSouth") Petition For Judicial Review And Complaint For Declaratory Judgment And Other Relief ("Petition"), filed on March 22, 1999.

Also before the court is a Joint Memorandum Of Law For Reconsideration And In Opposition To Motion Of BellSouth Telecommunications, Inc. To Stay Order Of The Alabama Public Service Commission, which the court construes as a motion for reconsideration ("Motion For Reconsideration"), filed on March 26, 1999 by Defendants KMC Telecom, Inc. ("KMC"), Intermedia Communications, Inc. ("Intermedia"), and Hyperion Telecommunications, Inc. ("Hyperion"). Defendants KMC, Intermedia, and Hyperion also filed a Supplemental Filing In Support Of Joint Memorandum Of Law For Reconsideration And In Opposition To Motion Of BellSouth Telecommunications, Inc. To Stay Order Of The Alabama Public Service Commission ("Supplemental Filing") on March 31, 1999. Plaintiff BellSouth filed a Reply To Joint Memorandum Of Law For Reconsideration And In Opposition To BellSouth's Motion To Stay Order Of The Alabama Public Service Commission, which the court construes as a response ("Response To Motion For Reconsideration"), on April 2, 1999. Defendants KMC, Intermedia, Hyperion, and ITC^DeltaCom Communications ("ITC") filed a Supplemental Memorandum Of Law In Further Support Of Request For Reconsideration Of March 23, 1999 Order ("Supplemental Memorandum") on April 9, 1999. BellSouth filed a Reply To Supplemental Memorandum Of Law In Further Support Of Request For Reconsideration Of March 23, 1999 Order, which the court construes as a response ("Supplemental Response"), on April 22, 1999. Additionally, KMC, Intermedia, Hyperion, and ITC filed a Statement Of Supplemental Authority on July 6, 1999.

Also before the court is a Motion To Vacate This Court's March 23, 1999 Order Granting BellSouth's Motion To Stay Order Of The Alabama Public Service Commission ("Motion To Vacate"), filed by Defendant e.spire Communications, Inc. ("e.spire") on March 31, 1999.

Also before the court is a Motion To Dismiss filed by Defendants Alabama Public Service Commission ("APSC"), Jim Sullivan, Jan Cook, and George C. Wallace, Jr. (collectively, "APSC Defendants") on April 19, 1999 together with their Brief In

Support Of Motion To Dismiss. On May 14, 1999, BellSouth filed its Opposition To Motion To Dismiss filed by the APSC Defendants, which the court construes as a response. The APSC Defendants filed their Response To BellSouth Telecommunication Inc.'s Memo In Opposition To Motion To Dismiss, which the court construes as a reply.

Also before the court is a Motion To Dismiss, filed by Defendant ICG Telecom Group, Inc. ("ICG") on April 29, 1999 along with ICG's Memorandum In Support Of Motion To Dismiss. Plaintiff BellSouth filed its Response To ICG's Motion To Dismiss on May 14, 1999.

After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that: (1) Plaintiff BellSouth's March 22, 1999 Petition is due to be dismissed; (2) Defendants KMC, Intermedia, Hyperion, and ITC's Motion For Reconsideration is due to be denied as moot; (3) Defendant e.spire's Motion To Vacate is due to be denied as moot; (4) the APSC Defendants' Motion To Dismiss is due to be denied as moot; and (5) Defendant ICG's Motion To Dismiss is due to be denied as moot.

## BACKGROUND

Prior to enactment of the Telecommunications Act of 1996, 47 U.S.C. § 151, et seq. ("the Act"), telephone service in a geographic area typically was provided by a single company. (Pet. at 4.) The Act was designed to enhance the development of competitive markets, and, to this end, the Act both mandated competition and established procedures and rules for such competition. *See* 47 U.S.C. §§ 251, 252. "These rules allow new carriers to offer

local telephone services by either purchasing the necessary components from another telecommunications provider to create a service or buying the finished service from another provider at wholesale prices in order to resell to local consumers." (Pet. at 4.) For instance, the Act imposes on each telecommunications carrier a duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a)(1).[1] Further, each local exchange carrier ("LEC") has a duty "to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5).[2] Additionally, each incumbent local exchange carrier ("incumbent LEC" or "ILEC") has the following duty:

[To] provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network—(A) for the transmission and routing of telephone exchange service and exchange access; (B) at any technically feasible point within the carrier's network; (C) that is at least equal in quality to that provided by the local exchange carrier itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and (C) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the [interconnection] agreement and the requirements of this section and section 252 of this title.

47 U.S.C. § 251(c).

The Act provides a four-step process to guide parties toward achieving an interconnection agreement. *See* 47 U.S.C. § 252. Specifically, § 252 first provides

1. The Act defines "telecommunications carrier" as "any provider of telecommunications services, except that such term does not include aggregators of telecommunications services...." 47 U.S.C. § 153(44). The Act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the

public, regardless of the facilities used." *Id.* § 153(46).

2. The Act defines "local exchange carrier" as "any person that is engaged in the provision of telephone exchange service or exchange access." 47 U.S.C. § 153(26).

for agreements to be arrived at through negotiation or mediation. 47 U.S.C. § 252(a). Second, if an agreement is not reached via negotiation or mediation, the Act provides for compulsory arbitration. *Id.* § 252(b). Third, once an agreement is executed, said agreement must be submitted to the state commission for approval, here the APSC. *Id.* § 252(e). Finally, the United States district courts have exclusive jurisdiction to review a state commission's determination. *Id.* § 252(e)(6).

Plaintiff BellSouth is an incumbent LEC, and Defendants ITC, ICG, KMC, Intermedia, e.spire, and Hyperion are competitive LECs ("CLEC Defendants"). Pursuant to the Act, BellSouth entered into separate interconnection agreements with the CLEC Defendants. (Pet. at 4–5.) These interconnection agreements were approved by the Alabama Public Service Commission ("APSC"). (*Id.* at 5.) Each agreement contained reciprocal compensation provisions such that "the parties agreed to pay each other reciprocal compensation only for termination of local traffic originated on the network of one party and terminated on the network of the other party." (*Id.*)

The Parties dispute "whether calls that connect customers to the Internet are[,] under the Interconnection Agreements and under Federal law, local traffic subject to the reciprocal compensation requirements of the Interconnection Agreements." (*Id.*) To connect to the Internet, a call is made to an Internet service provider ("ISP"), usually via a seven-digit local number that the customer dials to access the Internet ("ISP calls" or "ISP-bound traffic"). (*Id.* at 6.) Arguing that "such calls do not fall under the reciprocal compensation provisions," (*Id.*), BellSouth refused to pay reciprocal compensation for said calls.

Defendants ITC and ICG filed petitions with Defendant APSC ("APSC Petitions"), wherein they "sought a determination...as to whether calls from BellSouth customers to customers of the CLECs that happen to be ISPs are eligible for reciprocal compensation pursuant to the terms of their interconnection agreements." (Memo. For Recons. at 4.) On September 3, 1998, the APSC held a hearing, in which Defendants KMC, Intermedia, e.spire, and Hyperion ("Intervenors") intervened.

On March 4, 1999, the APSC issued its Order, wherein it determined that, "with regard to the interconnection agreements BellSouth entered with ITC DeltaCom, KMC, Intermedia and e.spire, telephone calls originating and terminating in the same local calling area from a BellSouth provided telephone service end user to the respective ISP end users of the effected [sic] CLEC Petitioners/Intervenors qualifies [sic] as local traffic which is subject to reciprocal compensation." *In re Emergency Pet. of ICG Telecom Group, Inc. & ITC DeltaCom Communications, Inc. for a Declaratory Ruling,* Alabama Public Service Commission Docket No. 26619, 26 (Mar. 4, 1999) ("Order"). Further, the APSC ordered that BellSouth, "within 20 days of the effective date of this order, pay all reciprocal compensation amounts withheld for ISP traffic under their interconnection agreements with ITC DeltaCom, KMC and Intermedia. BellSouth must also continue to pay such amounts for the duration of those interconnection agreements." *Id.*

On March 22, 1999, BellSouth commenced the above-styled action by filing a Petition For Judicial Review And Complaint For Declaratory Judgment And Other Relief ("Petition") in this court against Defendants ITC, ICG, KMC, Intermedia, e.spire, Hyperion, and APSC. BellSouth seeks the following relief: (1) judicial review of the APSC Order; (2) "a judgment declaring that the telecommunications traffic in question is interstate— not local—in nature, and therefore not subject to the reciprocal compensation provisions of the Interconnection Agreements" (Pet. at 11); and (3) injunctive relief "enjoin[ing] the [APSC] from ordering BellSouth to pay reciprocal compensation for termination of calls delivered to

ISP end users, because those calls are interstate in nature." (*Id.* at 12.)

Also on March 22, 1999, BellSouth filed an Emergency Motion To Pay Into Court Amounts Owed Under The APSC Order ("Emergency Motion"), wherein BellSouth moved the court for leave to deposit into the court sums due to ITC, KMC and Intermedia under the APSC Order. (Emergency Mot. at 3.) On that same date, BellSouth filed a Motion To Stay, wherein BellSouth moved the court to stay the APSC Order. (Mot. To Stay at 2.) The court held a hearing in Chambers on March 23, 1999 and granted both Bell-South's Motion To Stay and Emergency Motion by Order entered March 23, 1999. Subsequently Defendants KMC, ITC, Intermedia, and Hyperion moved the court to reconsider its March 23, 1999 Order. (Mot. For Recons. at 21.) BellSouth replied to said Motion For Reconsideration. (Resp. To Mot. For Recons.) [3] The court now considers BellSouth's Petition.

## DISCUSSION

### I. *Standard and Scope of Review*

■ The Act provides for judicial review by federal district courts as follows:

In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

47 U.S.C. § 252(e)(6). Although the Act fails to specify either the standard or scope of review, both can be gleaned from case law. The following standard of review has been developed through case law:

[I]t is neither desirable nor practical for this court to sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act.... Rather, this court's principal task is to determine whether the [Commission] properly interpreted and applied the Act, which is *a question of federal law that is reviewed de novo. In all other respects, review will be under the arbitrary and capricious standard.*

*MCI Telecomm. Corp. v. GTE Northwest, Inc.,* 41 F.Supp.2d 1157, 1161 (D.Or.1999) (emphasis added); *see also SouthWestern Bell Tel. Co. v. AT & T Comm.,* No. A 97–CA–132 SS, 1998 WL 657717, \*3 (W.D.Tex. Aug. 31, 1998) (stating that state commission "interpretations of federal law—either provisions of the statute itself or the applicable FCC regulations—are reviewed de novo" and "determinations of fact and its application of facts to law are reviewed under the 'arbitrary and capricious' standard of review"); *AT & T Communications of Southern States, Inc. v. BellSouth Telecommunications, Inc.,* 7 F.Supp.2d 661, 668 (E.D.N.C.1998); *U.S. West Communications, Inc. v. Hix,* 986 F.Supp. 13, 19 (D.Colo.1997). The court hereby adopts this standard.

■ Regarding the scope of review, "there is general agreement that review under § 252(e)(6) is confined to the administrative record." *MCI Telecomm. Corp.,* 41 F.Supp.2d at 1161; *see also U.S. West Communications, Inc. v. Jennings,* 46 F.Supp.2d 1004, 1008 (D.Ariz.1999). Further, a state commission's actions are not reviewed for compliance with state law. *See Illinois Bell Tel. Co. v. Worldcom Tech., Inc.,* 179 F.3d 566, 571 (7th Cir. 1999). Thus, the issue before the court is *not* "whether the [APSC] correctly applied principles of state contract law," *Id.* at 572; rather, the court's task is "to see whether [the APSC's] decision [regarding reciprocal compensation for telephone connections

---

**3.** The court notes that the Parties have presented their arguments concerning the likelihood of BellSouth's success on the merits of BellSouth's challenge to the APSC Order.

(*See* Defendants' Mot. For Recons. at 14–20; Plaintiff's Resp. To Mot. For Recons. at 10–13.)

to Internet service providers] violates federal law, as set out in the Act or in the FCC's interpretation." *Id.*

## II. *FCC Declaratory Ruling*

On February 26, 1999, the Federal Communications Commission ("FCC") issued its most recent interpretation of the Act in its Declaratory Ruling in CC Docket No. 96–98 and Notice of Proposed Rulemaking in CC Docket No. 99–68 ("Declaratory Ruling").[4] Therein the FCC addresses "whether a local exchange carrier (LEC) is entitled to receive reciprocal compensation for traffic that it delivers to an information service provider, particularly an Internet service provider (ISP)." Decl. Ruling at 1. The FCC concluded that "ISP-bound traffic is jurisdictionally mixed and appears to be largely interstate." *Id.* at 2. The FCC recognized that "parties entering into interconnection agreements may reasonably have agreed, for the purposes of determining whether reciprocal compensation should apply to ISP-bound traffic, that such traffic should be treated in the same manner as local traffic." *Id.* at 15. Further, "[e]ven where parties to interconnection agreements do not voluntarily agree on an inter-carrier compensation mechanism for IS:-bound traffic, state commissions nonetheless may determine ... that reciprocal compensation should be paid for this traffic." *Id.* at 16.

The FCC determined that "neither [the Act] nor our rules prohibit a state commission from concluding in an arbitration that reciprocal compensation is appropriate in certain instances not addressed by section 251(b)(5), so long as there is no conflict with governing federal law." *Id.* at 17–18. Further, the FCC declared that "[a] state commission's decision to impose reciprocal compensation obligations in an arbitration proceeding—or a subsequent state commission decision that those obligations encompass ISP-bound traffic—does not con-

flict with any Commission rule regarding ISP-bound traffic." *Id.* Thus, the FCC concluded:

> We recognize that our conclusion that ISP-bound traffic is largely interstate might cause some state commissions to re-examine their conclusion that reciprocal compensation is due to the extent that those conclusions are based on a finding that this traffic terminates at an ISP server, but *nothing in this Declaratory Ruling precludes state commissions from determining, pursuant to contractual principles or other legal equitable considerations, that reciprocal compensation is an appropriate interim inter-carrier compensation rule pending completion of the rulemaking we initiate below.*

*Id.* at 18 (emphasis added).

## III. *APSC Order*

Subsequent to the FCC's issuance of the Declaratory Ruling, the APSC addressed ICG and ITC's APSC Petitions in its March 4, 1999 Order.. The APSC qualified the scope of its Order, stating that:

> [A]t this juncture...we are not herein determining the generic issue of the jurisdictional nature of ISP traffic. To the contrary, we are considering the jurisdictional nature of such traffic only to the extent that it is prudent and necessary to determine *the intent of the parties when they entered the interconnection agreements* which we have been requested to review.

Order at 8 (emphasis added). Thus, the APSC addressed "whether the parties to the interconnection agreements under review intended, at the time those agreements were entered, to treat telephone calls originating and terminating in the same local calling area from a BellSouth provided telephone exchange service end user to the respective ISP end users of the effected CLEC Petitioners/Intervenors as

---

4. In its Declaratory Ruling, the FCC indicates that a federal ruling on the issue of reciprocal compensation for ISP-bound traffic is forth-

coming, but to the court's knowledge no such federal ruling has been issued as of the date of entry of this Order.

local traffic subject to the payment of reciprocal compensation." *Id.* at 20.

The APSC first focused on the actual language of the interconnection agreements. The APSC noted that BellSouth's interconnection agreements with ITC, KMC, e.spire, and Intermedia do not specifically reference ISP traffic. *Id.* Further, each agreement contains "similar definitions of local traffic and [each] similarly define[s] the reciprocal compensation obligations of the parties." *Id.* Also, each interconnection agreement has an "Entirety" or "Merger" clause specifying that the agreement "set[s] forth the entire understanding and agreement of the parties." *Id.* at 22. Assessing these interconnection agreements pursuant to Alabama's rules of contractual interpretation, the APSC determined that, as "none of those agreements address with specificity ISP traffic or the meaning of the word 'terminates' as used in each agreement's definition of local traffic ... [t]he silence of the agreements on these important matters does give rise to some reasonable ambiguity concerning the interpretation of the agreements." *Id.* at 23–24.

Second, the APSC focused on the intent of the Parties because, "[h]aving concluded that the agreements in question are reasonably subject to ambiguity, the determination of the true meaning of the agreements and the intent of the parties becomes a question for the Commission." *Id.* at 24. The APSC determined that, at the time the interconnection agreements were made, the Parties did not intend to exclude ISP-bound traffic from being subject to the reciprocal compensation provisions. *Id.* at 26.

The APSC reached this conclusion by examining several factors. Specifically, the APSC noted that, "at the time the interconnection agreements in question were entered, ISP traffic was treated as local in virtually every respect by all industry participants including the F.C.C." *Id.* at 24. Further, the APSC found that "BellSouth was fully aware of the indus-

try's prevailingly local treatment of ISP traffic at the time that it entered the interconnection agreements," noting that "BellSouth itself afforded ISP traffic prevailingly local treatment in the same respects that the CLECs did at that time." *Id.*

The APSC also found persuasive evidence demonstrating that BellSouth was aware of a 1989 decision of the Florida Public Service Commission ("FPSC"), wherein the FPSC held that calls to ISPs should be viewed as jurisdictionally intrastate local exchange calls. *Id.* at 25 (citing *Investigation Into the Statewide Offering of Access to the Local Network for Purposes of Providing Information Services,* Docket No. 880423–TP, Order (Sep. 5, 1989, Florida Public Service Commission) ("Florida Order")). Based on BellSouth's knowledge of both industry custom and the Florida Order, the APSC determined that, "[i]f there was indeed no intention to encompass ISP traffic within the meaning of local traffic as BellSouth claims, it is reasonable to assume that BellSouth would have taken steps to specifically exclude[ ] ISP traffic from the definition of local traffic in light of the Florida [ ] Order." *Id.* Indeed, the APSC determined that such prevalent treatment imposed on BellSouth "an obligation to negate such local treatment in the interconnection agreements it entered by specifically delineating that ISP traffic was not to be treated as local traffic subject to the payment of reciprocal compensation," which BellSouth did not do. *Id.*

Finally, the APSC noted a "conspicuous absence of a mechanism to track, separate and exclude ISP traffic from the local billing records of the CLEC Petitioners/Intervenors." *Id.* The APSC found this absence to evidence "that BellSouth did not intend to exclude calls to ISPs from the definition of local traffic" because "BellSouth was certainly in a position to know that such a mechanism would be necessary to segregate ISP traffic from local calls." *Id.*

Based on the foregoing, the APSC concluded that, "with regard to the interconnection agreements BellSouth entered with ITC DeltaCom, KMC, Intermedia and e.spire, telephone calls originating and terminating in the same local calling area from a BellSouth provided telephone service end user to the respective ISP end users of the effected CLEC Petitioners/Intervenors qualifies [sic] as local traffic which is subject to reciprocal compensation." *Id.* at 26. Further, the APSC determined that "BellSouth was clearly in a position to know that the exclusion of such traffic from the definition of local traffic for purposes of the payment of reciprocal compensation was a necessity." *Id.* The APSC determined that BellSouth did not incorporate such an exclusion and, thus, was in breach of the interconnection agreements for withholding reciprocal compensation for ISP traffic. *Id.*

BellSouth now challenges the APSC's Order on the following grounds. First, BellSouth claims that, contrary to the APSC's determination, Internet traffic is jurisdictionally interstate rather than local, as recently determined by the FCC. (Pet. at 7.) Second, BellSouth challenges the APSC's construction of its intent. Specifically, BellSouth attacks the APSC's consideration of BellSouth's treatment of ISP-bound traffic as local. (Reply at 12.)

## IV. *Analysis*

Applying the standard of review articulated above, the court finds that BellSouth's challenges to the APSC Order fail and that said Order is due to be affirmed. Initially, the court notes that, while the FCC states in the Declaratory Ruling that "ISP-bound traffic is jurisdictionally mixed and appears to be largely interstate," Decl. Ruling at 2, the FCC explicitly states that

"parties may have agreed to reciprocal compensation for ISP-bound traffic," and that such agreement is permissible absent violation of federal law or regulation. *Id.* Thus, the court examines the APSC's assessment of the terms to which the Parties agreed and whether such terms violate federal law.

■■■ First, the court conducts a de novo review of the APSC's legal conclusion that the interconnection agreements are ambiguous as to whether ISP-bound traffic is subject to the reciprocal compensation provisions. The court applies the following rules of contract construction. "In interpreting a contract, the words of the agreement must be given their ordinary meaning." *American Farm Bureau Fed'n v. Alabama Farmers Fed'n*, 935 F.Supp. 1533, 1544 (M.D.Ala.1996), *aff'd*, 121 F.3d 723 (11th Cir.1997) (citation omitted). "[A] contract is unambiguous if only one reasonable meaning emerges, and the fact that parties allege different constructions of an agreement does not necessarily establish its ambiguity." *Id.* (internal citation omitted). That is, "[a] contract term is ambiguous if [it is] 'reasonably susceptible to more than one interpretation....'" *Reynolds v. Alabama Dep't of Transp.*, 926 F.Supp. 1077, 1082 (M.D.Ala.1996) (quoting *Orkin Exterminating Co. v. F.T.C.*, 849 F.2d 1354, 1360 (11th Cir.1988)). "To determine whether a writing is ambiguous, the court must first assess the plain meaning of the language of the writing and determine whether there are two possible reasonable interpretations." *Id.* If there are two possible reasonable interpretations, "the court must strive to give effect to the intention of the parties." *Id.*

■■ The issue is whether calls to ISPs constitute local traffic subject to the reciprocal compensation provisions.[5] Address-

---

**5.** The relevant provisions of the interconnection agreements are as follows:

1. The ITC/BellSouth agreement defines "local traffic" as follows: " 'Local traffic' means any telephone call that originates in one exchange or LATA and terminates in ei-

ther the same exchange or LATA or a corresponding Extended Area Service ("EAS") exchange." ITC/BellSouth agreement at Attachment B, Item 49. Further, the agreement states that, "[w]ith the exception of the local traffic specifically identified in sub-

ing ISP-bound traffic, the FCC has stated that:

> If these [ISP-bound] calls terminate at the ISP's local server (where another (packet-switched) "call" begins), as many CLECs contend, then they are intrastate calls, and LECs serving ISPs are entitled to reciprocal compensation for the "transport and termination" of this traffic. If, however, these calls do not terminate locally...then LECs serving ISPs are not entitled to reciprocal compensation under section 251(b)(5).

(Decl. Ruling at 6.) Thus, the central inquiry concerns where such calls terminate. None of the agreements, however, defines the meaning of "terminate." Further, the agreements fail to specifically reference ISP-bound traffic. Thus, the court finds such agreements to be ambiguous as to whether ISP-bound traffic is subject to the reciprocal compensation provisions.

Second, pursuant to the rules of contract construction enunciated above, since the court finds an ambiguity to exist, the next section (C) hereafter, each party agrees to terminate local traffic originated and routed to it by the other party. Each party will pay the other for terminating its local traffic on the others [sic] network the local interconnection rate of $.009 per minute of use in all states...." *Id.* at August 22, 1997 Fourth Amendment, Item 3.

The court notes that "LATA" is the acronym for "local access transport area," which means:

> [A] contiguous geographic area—(A) established before February 8, 1996, by a Bell operating company such that no exchange area includes points within more than 1 metropolitan statistical area, consolidated metropolitan statistical area, or State...; or (B) established or modified by a Bell operating company after February 8, 1996, and approved by the Commission.

47 U.S.C. § 153(25).

2. The KMC/BellSouth interconnection agreement defines "local traffic" as:

> [C]alls between two or more Telephone Exchange Service users where both telephone exchange services bear NPA–NXX designations associated with the same local calling area of the incumbent LBC or other authorized area.... Local traffic includes the traffic types that have been traditionally referred to as "local calling" and as "Extended Area Service (EAS)." All other traffic that originates and terminates between the end users within the LATA is toll traffic. In no event shall the local traffic area for purposes of local call termination billing between the parties be decreased.

KMC/BellSouth interconnection agreement § 1.41. Further, the agreement states that "reciprocal compensation" "is as described in the Act and refers to the payment arrangements that recover costs incurred for the transport and termination of telecommunications traffic originating on one party's network and terminating on the other party's network." *Id.* § 1.59. The agreement also provides that "[t]he parties shall compensate each other for transport and termination of local traffic (local call termination) at a single identical reciprocal and equal rate...." *Id.* § 5.8.2. Moreover, "[t]he reciprocal compensation arrangements set forth in this agreement are not applicable to switched exchange access service. All switched exchange access service and all intraLATA toll traffic shall continue to be governed by the terms and conditions at the applicable federal and state tariffs." *Id.* § 5.8.3.

3. The Intermedia/BellSouth agreement defines "local traffic" as "any telephone call that originates in one exchange and terminates in either the same exchange or a corresponding Extended Area Service ("EAS") exchange." Intermedia/BellSouth interconnection agreement § 1.D. Regarding reciprocal compensation, the Intermedia/BellSouth agreement provides that "[e]ach party will pay the other for terminating its local traffic on the others' network the local interconnection rates as set forth in Attachment B–1..." *Id.* § 4.B.

4. The e.spire/BellSouth agreement defines "local traffic" as "any telephone calls that originate in one exchange and terminate in either the same exchange or a corresponding Extended Area Service ("EAS") exchange." e.spire/BellSouth interconnection agreement at Attachment B, Item 48. Further, the agreement states that:

> The parties agree...that local interconnection is defined as the delivery of local traffic to be terminated on each party's local network so that customers of either party have the ability to reach customers of the other party without the use of access codes or delay in the processing of the call. The parties further agree that the exchange of traffic on BellSouth's Extended Area Service (EAS) shall be considered local traffic and compensation for the termination of such traffic shall be pursuant to the terms of this section.

*Id.* § 7.A.

step is to determine the intention of the parties at the time the agreements were entered. *See Reynolds,* 926 F.Supp. at 1082. The court reviews the APSC's determination of the Parties' intentions under the arbitrary and capricious standard of review.

In determining the Parties' intentions, the APSC considered the following factors: (1) that, "at the time the interconnection agreements in question were entered, ISP traffic was treated as local in virtually every respect by all industry participants including the F.C.C." (Order at 24); (2) that "BellSouth was fully aware of the industry's prevailingly local treatment of ISP traffic at the time that it entered the interconnection agreements" (*Id.*); (3) that "BellSouth itself afforded ISP traffic prevailingly local treatment in the same respects that the CLECs did at that time" (*Id.*) [6]; (4) that since 1983 the FCC has "treated enhanced service providers, of which ISPs are a subset, as end users under the access charge regime and permitted them to purchase their links to the public switched telephone network through intrastate local business tariffs rather than through interstate access tariffs" (*Id.* at 24–25); (5) that BellSouth was aware of the 1989 FPSC decision, "wherein the Florida Commission held that calls to ISPs should be viewed as jurisdictionally intrastate local exchange calls" (*Id.* at 25); and (6) that, when BellSouth entered into the interconnection agreements, no mechanism existed to track, separate, and exclude ISP traffic from the local billing records of the CLEC Petitioners/Intervenors, even though "BellSouth was certainly in a position to know that such a mechanism would be necessary to segregate ISP traffic from local calls." (*Id.*)

 BellSouth challenges the third factor (that BellSouth itself afforded ISP traffic prevailingly local treatment in the same respects that the CLECs did at that time). Specifically, BellSouth argues that, since the FCC requires BellSouth to serve ISPs out of intrastate tariffs, the fact that BellSouth does so does not reflect an intent to pay reciprocal compensation for ISP traffic. (Reply at 12.) BellSouth also contends that the facts that the revenues BellSouth receives from serving ISPs may be counted as intrastate revenues and that the local exchange facilities used to serve ISPs are treated as intrastate for separations or other purposes are not conclusive with respect to BellSouth's intent because "[t]hese facts flow directly from the FCC's decision to treat 'ISP-bound traffic as though it were local.'" (*Id.* (citation omitted).)

In its Declaratory Ruling, the FCC states that the following evidence is permissible for use by a state commission in making a determination of intent:

> When construing the parties' agreements to determine whether the parties so agreed [whether reciprocal compensation should apply to ISP-bound traffic], state commissions have the opportunity to consider all the relevant facts,

---

**6.** Specifically, the APSC focused on the following factors as evidencing BellSouth's treatment of ISP-bound calls:

> [B]oth BellSouth and the CLEC Petitioners/Intervenors charge their ISP customers local business line rates for local telephone exchange service that enables the ISPs' customers to access their service via a local call. The service provided to ISP customers by BellSouth and the CLEC Petitioners/Intervenors falls under their local exchange tariffs and calls to ISPs are rated and billed just as any other local call placed via a seven digit local telephone number. Neither BellSouth nor the CLEC Petitioners/Intervenors assess toll charges for those calls. BellSouth specifically advises consumers subscribing to its Internet service provider that access to the BellSouth ISP is achieved via a local call.
>
> As further indication of the prevailingly local treatment afforded to ISP traffic, BellSouth records the minutes of use associated with such calls as local for ARMIS reporting requirements with the FCC. Further, BellSouth characterizes expenses and revenues associated with ISP-bound traffic as intrastate for jurisdictional separations purposes.
>
> Order at 24.

including...the conduct of the parties pursuant to those agreements. For example, it may be appropriate for state commissions to consider such factors as whether incumbent LECs serving ESPs (including ISPs) have done so out of intrastate or interstate tariffs; whether revenues associated with those services were counted as intrastate or interstate revenues; whether there is evidence that incumbent LECs or CLECs made any effort to meter this traffic or otherwise segregate it from local traffic, particularly for the purposes of billing one another for reciprocal compensation; whether, in jurisdictions where incumbent LECs bill their end users by message units, incumbent LECs have included calls to ISPs in local telephone charges; and whether, if ISP traffic is not treated as local and subject to reciprocal compensation, incumbent LECs and CLECs would be compensated for this traffic.

Decl. Ruling at 15–16. The court finds that the evidence challenged by BellSouth is encompassed within the materials specifically contemplated by the FCC for consideration in an intent-determination and, therefore, that it was neither arbitrary nor capricious for the APSC to consider same in making its determination.

 The court further finds that the APSC's consideration of the other factors was neither arbitrary nor capricious. Several of these factors, namely the first, second, and fourth, concern the industry's historical treatment of ISP-bound traffic. The FCC's Declaratory Ruling specifically comments on said treatment:

> The Commission's treatment of ESP [enhanced service provider, of which ISPs are a subset] traffic dates from 1983 when the Commission first adopted a different access regime for ESPs. Since then, the Commission has maintained the ESP exemption, pursuant to which it treats ESPs as end users under the access charge regime and permits them to purchase their links to the

PSTN through intrastate local business tariffs rather than through interstate access tariffs. As such, the Commission discharged its interstate regulatory obligations through the application of local business tariffs. *Thus, although recognizing that it was interstate access, the Commission has treated ISP-bound traffic as though it were local.*

Decl. Ruling at 15 (emphasis added). The FCC explicitly acknowledges that this backdrop may evidence parties' intent concerning the treatment of ISP-bound calls in interconnection agreements:

> Against this backdrop, and in the absence of any contrary Commission rule, parties entering into interconnection agreements may reasonably have agreed, for the purposes of determining whether reciprocal compensation should apply to ISP-bound traffic, that such traffic should be treated in the same manner as local traffic. When construing the parties' agreements to determine whether the parties so agreed, state commissions have the opportunity to consider all the relevant facts, *including the negotiation of the agreements in the context of this Commission's longstanding policy of treating this traffic as local* . . . .

*Id.* (emphasis added). Thus, the court finds that the APSC's consideration of the first, second, and fourth factors was permissible and neither arbitrary nor capricious.

Further, the FCC in the Declaratory Ruling explicitly referenced the sixth factor (whether there existed a mechanism to track, separate, or exclude ISP traffic from local billing records of CLECs) as one permissible for examination in making a determination of parties' intent: "[I]t may be appropriate for state commissions to consider...whether there is evidence that incumbent LECs or CLECs made any effort to meter this traffic or otherwise segregate it from local traffic, particularly for the purpose of billing one another for reciprocal compensation." *Id.* at 15–16.

Thus, the court finds the APSC's consideration of said factor neither arbitrary nor capricious.

Finally, the court finds that it was neither arbitrary nor capricious for the APSC to take into account BellSouth's knowledge of industry custom (second factor) and knowledge or the 1989 FPSC's decision (fifth factor). Such knowledge, which is not denied by BellSouth, is clearly relevant in determining BellSouth's state of mind at the time the interconnection agreements were entered. Such knowledge inclines the court to agree with the APSC's assessment:

> The prevailingly local treatment afforded to ISP traffic by industry participants at the time the agreements under review were entered, and BellSouth's knowledge of that industry custom and usage, made it imperative that BellSouth specifically exclude calls to ISPs from the definition of local traffic subject to the payment of reciprocal compensation. Given the circumstances then existing, we find the absence of such a specific exclusion or exception to be persuasive of the fact that BellSouth did not intend to exclude ISP traffic from the definition of local traffic when it entered the agreements in question.

Order at 26.

The court notes that, in support of its argument that ISP traffic is jurisdictionally interstate, BellSouth references a state commission ruling decided subsequent to the FCC's Declaratory Ruling.[7] In *Order Denying Application for Rehearing*, Missouri Public Service Commission, Docket NO. TO–98–278 (Mar. 9, 1999), the Missouri Commission construed the FCC Declaratory Ruling as "declar[ing] that traffic delivered to an ISP is interstate in character, thus falling within the primary jurisdiction of the FCC." *Id.* at 2. As discussed above, the court finds that, while the FCC determined that ISP-bound traffic is primarily interstate in nature, the FCC explicitly stated that such determination did *not* preclude a state commission from determining that, at the time the parties entered into an interconnection agreement, the parties intended said agreement to provide reciprocal compensation for ISP-bound traffic. *See* Decl. Ruling at 18. The FCC further determined that, absent a federal ruling to the contrary, such provision is permissible. *See id.*

Further, the court notes three other state commission decisions issued subsequent to the FCC's Declaratory Ruling, wherein each commission found that, given the intent of the parties at the time the agreements were entered, the agreements provided for reciprocal compensation for ISP-bound traffic. *See ICG Telecom Group v. Ameritech OH*, Ohio Public Utilities Commission Nos. 97–1557–TP–CSS, 97–1723–TP–CSS, 98–308–TP–CSS, 1999 WL 485511, at *7 (Ohio P.U.C. May 5, 1999) (upon examination of the Declaratory Ruling, the FCC's existing policies at the time the agreement was entered, conduct of parties pursuant to agreement, practice of serving ISPs out of the local intrastate tariffs, manner in which the revenues from ISP traffic were accounted for, and how end user charges are determined, finding that the parties intended that, "at the time the interconnection agreements were entered into, ISP-bound traffic would be treated as local traffic and subject to reciprocal compensation"); *Re American Communication Serv. of Jacksonville, Inc.*, Florida Public Service Commission

---

7. The court notes that BellSouth also cites *Re Pac–West Telecommunications, Inc.*, Nevada Public Utilities Commission Nos. 98–10015, 99–1007, 1999 WL 380994 (Mar. 4, 1999), as a state-commission decision that "found for the incumbent local exchange carrier and against the competitive local exchange carriers." (Reply at 11.) However, as later recognized by BellSouth, the Nevada Commission's decision was subsequently revised in *Re Pac–West Telecommunications, Inc.*, Nevada Public Service Commission Nos. 98–10015, 99–1007, 1999 WL 477181 (Nev.P.S.C. Apr. 8, 1999), wherein the Nevada Commission determined that reciprocal compensation should be paid for ISP-bound traffic when those customers are located within the same local calling area. *Id.* at *4.

Docket No. 981008–TP, 1999 WL 370264, at *4 (Fla.P.S.C. Apr. 6, 1999) (upon consideration of parties' actions subsequent to entering into agreement, finding that "the evidence in this case does not indicate that the parties intended to exclude ISP traffic from the definition of 'local traffic' in their Interconnection Agreement"); *Re Electric Lightwave, Inc.*, Oregon Public Utility Commission Order No. 99–218, 1999 WL 218135, at *2–3 (Or.P.U.C. Mar. 17, 1999) (upon consideration of the FCC Declaratory Ruling and local industry custom, finding that "ISP traffic should remain subject to reciprocal compensation pending adoption of a federal rule establishing an appropriate interstate compensation mechanism").

The court also finds persuasive the Seventh Circuit's recent decision in *Illinois Bell Tel. Co. v. Worldcom Tech., Inc.*, 179 F.3d 566, (7th Cir.1999). Thus far, the Seventh Circuit is the only Court of Appeals to address the issue "whether a decision of [a state commission] regarding reciprocal compensation for telephone connections to Internet service providers violates federal law." *Id.* at 568.

In *Illinois Bell,* the Illinois Commerce Commission ["ICC"] had concluded that the agreements unambiguously provide that, "[s]ince Ameritech Illinois currently charges end users local service charges when completing calls that terminate at the complainants' ISP customers, the plain reading of the interconnection agreements inevitably leads to the conclusion that reciprocal compensation charges should apply to those calls." *Id.* at 572 (citation omitted). The ICC also assessed the following factors in reaching its conclusion: the situation at the time the agreements were negotiated; the fact that Ameritech's customers do not pay toll charges for calls to their ISP; the fact that Ameritech bills the customer for a local call; the fact that customers dial a local number; and the fact that the calls are routed over local rather than long distance lines. *Id.*

In assessing the validity of the ICC's findings, the court looked to the FCC's Declaratory Ruling, as well as the intent of the parties. Specifically, the court noted that "the FCC would not agree with Ameritech that it has had a long-standing policy against treating calls to ISPs as local calls." *Id.* Further, the court noted that "[t]here is nothing in the FCC ruling on reciprocal compensation which would prohibit a call from being a local call for some, but not all, purposes." *Id.* The court upheld the ICC's findings, noting that "[t]he FCC could not have made clearer its willingness—at least until the time a rule is promulgated—to let state commissions make the call." *Id.*

## V. *Conclusion*

Based on the foregoing, the court finds that the APSC's conclusions of law, findings of fact, and application of said law to the facts survive BellSouth's challenge. Therefore, the court finds that BellSouth's Petition is due to be dismissed in its entirety.

### *ORDER*

Based on the foregoing, it is CONSIDERED and ORDERED that Plaintiff BellSouth's March 22, 1999 Petition be and the same is hereby DENIED, and that the claims contained therein be and the same are hereby DISMISSED.

It is further CONSIDERED and ORDERED that the stay entered by the court on March 23, 1999 be and the same is hereby LIFTED.

It is further CONSIDERED and ORDERED that the funds which were deposited with this court by BellSouth pursuant to the court's March 23, 1999 Order shall be disbursed upon appropriate motion by said Defendants.

It is further CONSIDERED and ORDERED that the Motion For Reconsideration filed by Defendants KMC, Intermedia, and Hyperion be and the same is hereby DENIED AS MOOT.

It is further CONSIDERED and ORDERED that Defendant e.spire's Motion To Vacate be and the same is hereby DENIED AS MOOT.

It is further CONSIDERED and ORDERED that the APSC Defendants' Motion To Dismiss be and the same is hereby DENIED AS MOOT.

It is further CONSIDERED and ORDERED that Defendant ICG's Motion To Dismiss be and the same is hereby DENIED AS MOOT.